**Frances SARACENO and Louis Saraceno, Plaintiffs,**

v.

**S. C. JOHNSON AND SON, INC. and Johnson Wax Europlant, B. V., Defendants.**

**No. 78 CIV 1788 (LBS).**

United States District Court, S. D. New York.

May 7, 1979.

Herzfeld & Rubin, P. C., New York City, for plaintiffs; Edward L. Birnbaum, Ian

Ceresney, Howard L. Wexler, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendant Johnson Wax Europlant, B. V.; Lawrence E. Walsh, Ogden N. Lewis, New York City, of counsel.

Simpson Thacher & Bartlett, New York City, for defendant S. C. Johnson & Son, Inc.; Edward C. Mendrzycki, Eugene H. Lieber, New York City, of counsel.

## OPINION

SAND, District Judge.

Plaintiff, a New York resident who was living in Spain, was allegedly injured when a can of Raid, manufactured by defendant Johnson Wax Europlant, B.V. ("Europlant") and sold in Spain, exploded.[1] She seeks damages alleging negligence and strict tort liability. In August, 1978 defendant Europlant moved pursuant to F.R. Civ.P. 12(b)(2) to dismiss the complaint for lack of *in personam* jurisdiction.[2] This Court deferred a decision on this motion pending discovery by the plaintiff.[3] At the completion of this discovery, defendant renewed its motion to dismiss.[4] For the reasons hereinafter stated, this motion is granted.

### Facts

Organized in 1964 as a Dutch corporation, Europlant is a wholly owned subsidiary of

1. There are two plaintiffs in this action: Frances Saraceno and her husband, Louis Saraceno. Frances Saraceno was involved in the events underlying this lawsuit, and we will refer only to her as the plaintiff.

 Plaintiff alleges that she is a resident of New York and claims that she was a New York resident at the time of the alleged accident even though she was living with her family in Seville, Spain. Defendant Europlant contends that plaintiff is not a resident of New York.

 For the purpose of this motion, however, this Court will deem plaintiff to be a New York resident at all relevant times. Although the burden of proof is on the plaintiff to sustain its assertion of jurisdiction, on a motion to dismiss, this Court must consider the pleadings and affidavits in the light most favorable to the plaintiff, who is the non-moving party. See *Top Form Mills v. Sociedad Nationale*, 428 F.Supp. 1237, 1241–42 (S.D.N.Y.1977) and cases cited therein.

2. S. C. Johnson & Son, Inc. ("Johnson") is also named as a defendant. Johnson has answered the complaint and has not interposed a jurisdictional defense.

3. See page 71, *infra*, for a discussion of prior discovery rulings.

4. In its reply papers, defendant attempts to expand the scope of its motion. For the first time, it argues that this action should be dismissed because New York is an inconvenient forum. In response, plaintiff argues that this motion is not properly before the Court. Because we find that the defendant is not subject to the jurisdiction of this Court, we need not resolve this issue.

S. C. Johnson & Son Ltd. of Canada ("Johnson Canada") and Johnson Wax International, A. G. ("Johnson International"). These corporations are in turn wholly owned subsidiaries of Johnson, a Wisconsin corporation which is licensed to do business in New York. Europlant's basic business is the manufacture of Johnson products for Johnson marketing companies in Europe, although it does a limited amount of production work for non-Johnson companies. Europlant itself has no contact with New York; it does not sell its products in New York nor does it have an office, telephone listing or authorized agent in New York.

■ The parties agree that the question whether Europlant is subject to suit in this diversity action is determined by reference to the law of New York. See *Arrowsmith v. United Press Int'l*, 320 F.2d 219 (2d Cir. 1963). The only basis of jurisdiction asserted by plaintiff is presence within the state. Where the presence of a foreign corporation is at issue, New York courts apply a "doing business" test to satisfy the rule that a "court may exercise such jurisdiction over persons, property, or status as it might have exercised heretofore". N.Y. C.P.L.R. § 301; see *Beja v. Jahangiri*, 453 F.2d 959, 961 (2d Cir. 1972); *Marantis v. Dolphin Aviation, Inc.*, 453 F.Supp. 803 (S.D.N.Y.1978); *Delagi v. Volkswagenwerk, A. G.*, 29 N.Y.2d 426, 431, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972); *Frummer v. Hilton Hotels Int'l Inc.*, 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967).

■ The "doing business" test does not subject a subsidiary corporation to personal jurisdiction simply because a state has jurisdiction over the parent, even if the parent is the sole shareholder of the subsidiary. See *Cannon Mfg. Co. v. Cudahy Packing Co.*,

267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); *Krane v. Gravely Motor Plow & Cultivator Co.*, 272 App.Div. 90, 69 N.Y.S.2d 175 (1st Dept. 1947). Rather, a foreign subsidiary may be found to be "present" in New York if (1) the relationship between the foreign parent and the local subsidiary gives rise to a valid inference of an agency relationship or (2) the control by the parent of the subsidiary is so complete that the subsidiary is, in fact, merely a department of the parent. See *Sun First National Bank v. Miller*, 77 F.R.D. 430 (S.D.N.Y. 1978); *Freeman v. Gordon & Breach, Science Publishers, Inc.*, 398 F.Supp. 519 (S.D. N.Y.1975); *Sunrise Toyota, Ltd. v. Toyota Motor Inc.*, 55 F.R.D. 519 (S.D.N.Y.1972).[5]

*Agency Relationship*

Plaintiff contends that Johnson acts as Europlant's agent for its sales to United States Pacific trust territories and also functions as Europlant's agent in the conduct of sales which are invoiced to New York. Besides these direct contacts, plaintiff argues that an agency relationship should be inferred from the fact that Johnson and Europlant share personnel, technology, information and products on a daily basis. Finally, plaintiff asserts that Johnson's advertisements of its products in New York was for the benefit of and as agent of Europlant.[6]

Europlant admits that it used nine suppliers in New York for invoiced goods ranging in price from $24. to $3,400. It argues, however, that these suppliers represent less than one-fifth of one percent of Europlant's suppliers by number and less than one-fiftieth of one percent by amount. Moreover, it denies that Johnson acts as its agent for these supplies or that it invoices any sales to New York. Thus, it contends that it is a

---

**5.** Most of these cases involve a New York subsidiary and a foreign parent. We find it immaterial for these purposes that the foreign corporation over which jurisdiction is sought to be established is the subsidiary of the corporation licensed to do business in New York, rather than the parent. See *Titu-Serban Ionescu v. E. F. Hutton & Co.*, 434 F.Supp. 80, 83 (S.D.N.Y. 1977).

**6.** In her memorandum, plaintiff stresses that she was the victim of Johnson's extensive advertisements in New York: "When temporarily overseas she [Mrs. Saraceno] relied on Johnson's New York advertising and purchased the toxic insecticide, which was manufactured in one of Johnson's plants." Plaintiff's Memorandum at 15. This allegation, however, does not appear in the complaint.

European corporation with little contact with New York:

"Europlant's products are *European* products. They are sold in foreign countries, under foreign labels in French, German, Italian, Dutch, Russian, Arabic—and Spanish as well as other languages. The can in the possession of plaintiff's counsel, and allegedly the cause of Mrs. Saraceno's injury, is a can manufactured for Spain, with its label in Spanish. Moreover, the advertising for Europlant's products is done by the Europlant marketing companies, again in the language of the nation in question. If sales are derived through the public dissemination of the trademarks on its products, they are sales generated in Europe." Defendant's Reply Memorandum at 41 [emphasis in original].

 We agree with defendant that the record does not support a finding that Johnson acted as Europlant's agent in New York. In *Frummer v. Hilton Hotels Int'l Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967), the New York Court of Appeals held that Hilton (U.K.), a British corporation, was "doing business" in New York because its New York affiliate published advertisements in New York, solicited sales in New York, and made reservations in New York for Hilton (U.K.). In reaching this result, the court articulated the following test: "In short—and this is the significant and pivotal factor—the [affiliate] does all the business which Hilton (U.K.) could do were it here by its own officials." 19 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 854.

This test is not satisfied here. Whatever its arrangements may be with respect to operations outside New York, Johnson does not act on Europlant's behalf in New York.

The record does not support a finding that had Johnson not published advertisements in New York, Europlant would have undertaken such activities in New York.[7] Moreover, the other activities on which plaintiff relies to support an inference of an agency relationship are not activities which Johnson performs in New York. For example, the exchange of personnel, technology or information, to the extent that these practices exist, takes place between the corporate headquarters of Johnson in Wisconsin and Europlant's facility in the Netherlands. Finally, there is no evidence in this record which indicates that the negotiation, drafting, execution or performance of the United States Pacific trust territories contract took place in New York.[8]

*"Mere Department":*

Plaintiff also contends that Europlant is subject to this Court's jurisdiction because it is a "mere department" of Johnson within the meaning of *Public Administrator v. Royal Bank of Canada,* 19 N.Y.2d 127, 278 N.Y.S.2d 378, 224 N.E.2d 877 (1967); *Taca Int'l Airlines v. Rolls-Royce,* 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965) and *Rabinowitz v. Kaiser-Fraser Corp.,* 198 Misc. 707, 96 N.Y.S.2d 642 (Kings Co. 1950), 278 App.Div. 584, 102 N.Y.S.2d 815 (2d Dept.), *aff'd mem.,* 302 N.Y. 892, 100 N.E.2d 177 (1951). According to plaintiff, the eighty-seven subsidiaries of Johnson form an integral corporate structure. Plaintiff argues that within this structure, Europlant's task is to manufacture and sell Johnson products to Johnson-owned subsidiaries in the Common Market countries.

Specifically, plaintiff argues that Europlant is a "mere department" of Johnson because: Johnson played a key role in the initial financing of Europlant; Johnson ap-

---

7. We also agree with defendant that the publication of advertisements, without more, has never been a basis for personal jurisdiction. See *Miller v. Surf Properties,* 4 N.Y.2d 475, 176 N.Y.S.2d 318, 151 N.E.2d 874 (1958).

8. Plaintiff also contends that Europlant made sales to United States military bases in Europe which were invoiced to New York. We agree with defendant that the record does not sup-

port the assertion that these were sales by Europlant. Rather, the record indicates that it was Johnson which manufactured and sold the products in question and that Europlant's role was the leasing of warehouse space. Accordingly, we have not considered these activities in determining whether Johnson acted as Europlant's agent in New York.

proves all major expenditures of Europlant; Johnson sets price guidelines for Europlant; Johnson determines Europlant's dividend; a common trademark is used on all Johnson products; several Johnson officers sit on Europlant's board; Europlant's general manager was trained by Johnson; Johnson subsidiaries share research and development functions; and Johnson issues a consolidated financial statement.

Europlant admits that, as a wholly-owned subsidiary, it is subject to the control of its shareholder, i. e., Johnson. Europlant contends, however, that under New York law, control alone is not sufficient to support jurisdiction. Rather, "the control [must be] exercised to such an extent that the corporate entity becomes a sham and the day-to-day operations of the corporate officers and even the corporate board are reduced to subservient activity". Defendants' Reply Memorandum at 2.

In this regard, Europlant argues that plaintiff has greatly exaggerated the role that Johnson plays in the day-to-day operations of Europlant. Although Europlant admits that its management participates in and adheres to the board policies established by Johnson in areas of financial concern, it contends that it functions without adherence to parent company guidelines in areas of operation, including purchasing, marketing, employment, production and pricing. At times, Europlant argues, its board of directors has rejected Johnson's suggestions and guidelines. For example, Europlant states that when senior Johnson officials sought to persuade Europlant to grant a rebate to the Italian marketing subsidiary because of currency fluctuations, Europlant steadfastly refused to do so. According to Europlant, it adhered to its own position on price differentials even though that policy conflicted with Johnson's preference for uniform prices regardless of country of sale.

Having reviewed the affidavits, the extensive evidentiary appendix and the briefs submitted by the parties, we conclude that Europlant's relationship with Johnson falls short of that corporate intimacy which has led New York courts to hold that a subsidiary is a "mere department" of the parent. The record indicates that Europlant is responsible for obtaining all of its own supplies. It does not obtain regular supplies from Johnson and it achieves no economies through use of Johnson-provided materials. Europlant determines the price of its products based on its own overall cost of goods sold, overhead and return on investment. It does its own billing and accounting.

Europlant sets its own production schedule. Although research and development costs are paid by Johnson, Europlant maintains its own quality control and product evaluation department. It products are registered with the appropriate agencies in the countries in which they are sold and distributed. American regulatory agencies do not exercise jurisdiction over any phase of Europlant's operation and, accordingly, no products manufactured by Europlant are registered with American federal or state regulatory agencies.

In the area of financing, Europlant maintains its own bank accounts at various locations in Europe. Europlant has loans outstanding from several banks, all located in Holland. None are guaranteed or collateralized or provide for recourse against any company other than Europlant.[9] Europlant's sales to the marketing companies generate accounts receivable which are obligations of the marketing companies and not guaranteed by Johnson.[10] Although Johnson recommends a dividend amount based on Europlant's budgeted earnings of the fiscal year, this recommendation is not necessarily followed by Europlant.

---

**9.** In connection with a loan of $10 million from the Nationale Bank voor Middellang Krediet, Johnson has given a credit letter stating that it will not permit its indirect share ownership of Europlant to be diminished during the term of the loan.

**10.** In the past three years, Europlant had average sales of 120,000,000 Dutch guilders (approximately $55,000,000. at present currency exchange rates).

Europlant is managed by a Board of Directors of eight members, a General Manager and eight departmental managers and a Worker's Council. While the authority of the General Manager is severely curtailed in some areas,[11] he is responsible for the day-to-day operations of the company. At this time he is the only management employee at Europlant who has had work experience or assignments at other Johnson companies.

All matters regarding employees' working conditions, benefits, salaries, job terminations, and safety are handled by the Worker's Council. The Council has the authority to present objections to the nominations of members of Europlant's board. Board members to whom the Council objects cannot sit on the board until the objection is resolved to the satisfaction of the Worker's Council or by arbitration, if that is agreed to, under independent governmental authority.

Annual shareholder meetings have usually been held in the Netherlands. All board meetings are held at Europlant's facility in the Netherlands. Corporate records are kept by Europlant, although a copy of these records is also maintained at Johnson headquarters in Racine, Wisconsin.

This record is a far cry from the corporate structure outlined in the two New York Court of Appeals cases which upheld jurisdiction relied upon by plaintiff. In *Taca Int'l Airways v. Rolls-Royce*, 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965), the New York Court of Appeals held

that an American subsidiary, though nominally independent, actually functioned as a department of its British parent. The underlying jurisdictional facts in *Taca* are stronger than the facts at bar: the wholly-owned subsidiary sold and serviced Rolls-Royce products which were manufactured by the British parent corporation. Corporate policy for all subsidiaries were set at conferences attended by executives of the various companies. Executive level personnel and members of the board of directors were rotated among the affiliate companies and were considered part of the Rolls-Royce employee group. Technical training and sales literature were provided to the subsidiary by the parent. Customer warranties emanated from the parent. Moreover, the subsidiary did not stock automobiles. When a sale was made to a customer, the subsidiary "purchased" a car from the parent and imported it. All of the American subsidiary's net income eventually appeared on the parent's consolidated statement. Finally, the subsidiary did not control its own day-to-day operations.[12]

Similarly, the facts in *Public Administrator v. Royal Bank of Canada*, 19 N.Y.2d 127, 278 N.Y.S.2d 378, 224 N.E.2d 877 (1967), are distinguishable. In that case, the Court of Appeals held that the Royal Bank of Canada (France) was not merely a subsidiary of the Royal Bank of Canada but was, in fact, if not in name, the Royal Bank of Canada, itself. It based its holding on the following facts:

11. The Europlant Board of Directors requires that the General Manager obtain board approval before selling significant assets, or liquidating or reorganizing the company. Moreover, Johnson requires that the General Manager obtain consent from Johnson before undertaking any major expenditure.

12. From the record, it appears that defendant *Rolls-Royce* limited its argument to the fact that "Thomason, who was actually served, was not an employee or officer of [the parent]; that [the parent] has no office, officer, bank account or telephone or directory listing in New York; that [the parent] and [the subsidiary] have entered into contracts whereby the latter gets a fixed percentage on its sales of cars and parts

and is compensated for other services to Rolls-Royce customers." 15 N.Y.2d at 102, 256 N.Y.S.2d at 132, 204 N.E.2d at 331.

A similar lack of evidentiary support is evident in *Rabinowitz v. Kaiser-Frazer Corp.*, 198 Misc. 707, 96 N.Y.S.2d 642 (Kings Co. 1950), *aff'd mem.*, 278 App.Div. 584, 102 N.Y.S.2d 815 (2d Dept.), *aff'd mem.*, 302 N.Y. 892, 100 N.E.2d 177 (1951), the authority relied on by the court in *Taca*. In *Rabinowitz*, the court stated that the defendant "makes no attempt to answer or refute the analysis of its corporate set-ups, contenting itself with a mere reiteration of its separate corporate entity as the basis for the vacatur of service." 198 Misc. at 711–12, 96 N.Y.S.2d at 645.

"[A]ll of the stock in the French corporation is owned by the Royal Bank of Canada, none of the other 1,145 branches of the bank in some 22 countries are separately incorporated and the bank makes no effort to distinguish or treat its French branch as a separate entity. The assets and liabilities of the French branch, like the assets and liabilities of all other branches, are carried on the books of the Royal Bank of Canada as part of its own assets and liabilities. In its general advertising, as well as on its letterheads the bank declares that France is one of many countries in which it has 'branches' and, in point of fact, the bank's annual report to its stockholders recites that the French branch was established 'to conduct *the business of the Bank* in Paris'. The deposit slips, checks, passbooks and other bank documents of the French branch are printed and standardized in Canada by the Royal Bank. Moreover, the staff of the French branch is not only recruited and trained by the bank in Montreal but the principal personnel are apparently and with frequency shifted about from Paris to the bank's home office and other branches. Finally, as the transactions in the record before us demonstrate, the French branch is merely notified and not consulted on accounts which are transferred to it from other Royal Bank branches, and the moneys in those accounts are reflected only in bookkeeping entries rather than by actual transfer of the funds to France." 19 N.Y.2d at 131–32, 278 N.Y.S.2d at 381–382, 224 N.E.2d at 879. [emphasis in original].

■ We disagree with plaintiff's contention that the relationship of Johnson and Europlant is analogous to the relationship described in *Taca* and *Royal Bank*. We find that Johnson has structured its corporate enterprise so that Europlant is independent in its day-to-day operations. While it is true that Johnson exercises a great deal of control over Europlant, we agree with Europlant that under New York law a parent of a multinational corporate enterprise may make broad policy decisions for its subsidiaries. Such control is inherent in the parent-subsidiary relationship and does not justify labeling a subsidiary a "mere department" of the parent.[13]

*Need for an Evidentiary Hearing*

■ Plaintiff has requested a plenary trial on the jurisdictional issue if this Court were otherwise inclined to grant defendant's motion to dismiss. Alternatively, plaintiff has requested that she be permitted to conduct further document discovery and to depose Europlant officials. Plaintiff, however, makes no showing that further discovery in addition to the intense discovery already undertaken would uncover a basis for jurisdiction.

Plaintiff has had ample opportunity to conduct discovery on the jurisdictional question. In November, 1978, Europlant responded to plaintiff's extensive interrogatories. Although these responses were over 132 pages in length, plaintiff moved to compel further discovery. Defendant crossmoved for a protective order. Both parties submitted extensive memorandum, affidavits and exhibits on these motions. After oral argument, this Court ordered that discovery with respect to the merits of this litigation be held in abeyance pending the determination of defendant's motion to dismiss. Plaintiff was permitted to examine all documents of Johnson, Johnson Wax Eurocentre, Johnson Canada, Johnson International and Europlant for the calendar years 1963, 1964, 1976, 1977 and 1978 which were located in the corporate headquarters of Johnson in Racine, Wisconsin. Plaintiff was also afforded an opportunity to examine Europlant's records at its headquarters in the Netherlands. At oral argument of

---

**13.** We do not reach the question whether, on the record before us, there is a constitutional basis for jurisdiction. In *Intermeat, Inc. v. American Poultry, Inc.*, 575 F.2d 1017 (2d Cir. 1978), the Second Circuit stated that the constitutional standard of due process may be met by fewer contacts than those required under the more restrictive statutory test of "doing business".

the instant motion, plaintiff's counsel informed the Court that they did not avail themselves of this latter opportunity.

While we recognize that a New York plaintiff has a strong interest in bringing suit in this forum, we must balance this interest against defendant's right to be free of the expense and annoyance of protracted discovery if, in fact, it is not subject to this Court's jurisdiction. Plaintiff has failed to pinpoint anything specific which she contends additional discovery would disclose. Given the inadequacy of plaintiff's showing and the extensive documentary discovery already conducted, we find that we have reached the point where it would be inappropriate to permit plaintiff to pursue further what is essentially a fishing expedition.

### Conclusion

Accordingly, Europlant's motion to dismiss for lack of *in personam* jurisdiction is granted.

SO ORDERED.