**ACTION MANUFACTURING CO., INC., et al., Plaintiffs,**

v.

**SIMON WRECKING CO., et al., Defendants**

No. Civ.A.02–CV–8964.

United States District Court, E.D. Pennsylvania.

June 20, 2005.

4. Dismissal of this action does not relieve Plaintiff of the obligation to pay the full filing fee.

David E. Romine, Larry D. Silver, Langsam Stevens & Silver LLP, Jeannette M. Brian, Leigh W. Marquardt, Howard Klein, Sarah Elise Pontoskise, Conrad O'Brien Gellman & Rohn, PC, Philadelphia, PA, Sandra G. Gibbs, Manko Gold Katcher & Fox, Bala Cynwyd, PA, for Plaintiffs.

Kimberly Stuart Kluchnick, Mattleman Weinroth & Miller, PC, Philip L. Hinerman, Fox Rothschild LLP, J. Robert Stoltzfus, Robert L. Collings, Schnader Harrison Segal & Lewis LLP, Andrew S. Levine, Stradley Ronon Stevens and Young LLP, Philadelphia, PA, Sharon Oras Morgan, Fox Rothschild, LLP, Wilmington, DE, George J. Ozorowski, Hughes Kalkrenner & Adshead LLP, Plymouth Meeting, PA, C. Shawn Dryer, Kevin K. Douglass, Matthew C. Landreth, Robert W. Thomson, Steven F. Baicker-Mckee, Babst Calland Clements & Zomnir P.C, Pittsburgh, PA, Joseph D. Picciotti, Harris Beach LLP, Pittsford, NY, David J. Staudt, Rees A. Griffiths, Barley Snyder Senft and Cohen L.L.C., York, PA, Matthew H. Haverstick, Barley Snyder, Lancaster, PA, Madelaine R. Berg, Stroock, Stroock & Lavan LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

### I. INTRODUCTION

Plaintiffs [1] (collectively referred to as "Action Manufacturing") brought this ac-

---

1. Plaintiffs are ABB, Inc., f/k/a Fischer & Porter Company; Action Manufacturing Co.,

tion against defendants[2] pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), and Pennsylvania's Hazardous Site Cleanup Act, 35 P.S.A. § 6020.101 *et seq.* ("HSCA"), for contribution and cost recovery of past and future response costs incurred in the environmental cleanup of a site located in Malvern, Pennsylvania (the "Malvern Superfund Site"). Plaintiffs also seek declaratory judgment. Jurisdiction is appropriate under 28 U.S.C. §§ 1331 & 1367. Currently before me is defendant World Fuel Services Corporation's ("World Fuel Corp." or "Corp.") motion to dismiss for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2). Plaintiffs responded by asserting personal jurisdiction over Corp. based upon general, rather than specific, jurisdiction. For the reasons set forth below, World Fuel Corp.'s motion to dismiss is granted.

## II. PROCEDURAL BACKGROUND

Action Manufacturing filed a Second Amended Complaint on October 26, 2004. (Doc. # 314.) In its complaint, Action Manufacturing alleged that defendant Re-

source Technology Services, Inc. ("RTS"), transported "hazardous substances" as defined under CERCLA to the Malvern Superfund Site. (2nd Am.Compl.¶¶ 55–57.) RTS allegedly sold its assets to defendant Resource Recovery Atlantic, Inc. ("Atlantic"). (*Id.* ¶ 59.) The complaint alleged that this asset sale constituted a *de facto* merger, that Atlantic is a mere continuation of defendant RTS, and that Atlantic is an alter ego of, a successor in interest to, or otherwise liable for the liabilities of RTS. (*Id.* ¶¶ 60–62.) Action Manufacturing also alleged that World Fuel Corp. was the "ultimate corporate parent" of Atlantic when Atlantic bought the assets of RTS, that World Fuel Corp. dominated Atlantic to such a degree that Atlantic was a mere instrumentality of Corp., and that Corp. is an alter ego of, a successor in interest to, or otherwise liable for the liabilities of RTS and Atlantic. (*Id.* ¶¶ 63–67.) The Second Amended Complaint was the first time World Fuel Corp. was named as a defendant in this action.[3]

On November 22, 2004, Corp. filed a motion to dismiss for lack of personal jurisdiction. (Doc. # 323; hereinafter "Def.'s Mot.") In response, on December 6,

---

Inc.; Alcoa, Inc., f/k/a Aluminum Company of America; Armstrong World Industries, Inc.; Beckett Company, L.P.; General Electric Company/RCA; General Motors Corporation; Hamilton Technologies, Inc. (Bulova Technologies, L.L.C.); Hamilton Watch Company, Inc. (*Swatch Group*, U.S., Inc.); Handy & Harman, Tube Co.; Hayfork, L.P., f/k/a Hamilton Precision Metals, Inc.; Hercules Incorporated; J.W. Rex; Lafrance Corporation; Lucent Technologies, Inc.; Penflex, Inc.; Plymouth Tube Company; Reilly Plating Company; Siemens Energy & Automation, Inc., f/k/a Moore Products, Co.; Sunroc Corporation, Inc.; Syntex (USA) Inc.; Unisys Corporation; and Viz Liquidation Trust.

2. The defendants remaining in this action are Simon Wrecking Company, Inc.; Simon Resources, Inc.; Mid–State Trading Company, Inc.; S & S Investments, Inc.; Schwab–Si-

mon Realty Corporation; Trenton Realty Corporation; Quaker City, Inc.; J & J Spill Services & Supplies, Inc.; Lightman Drum Co., Inc.; Resource Technology Services, Inc.; Marcegaglia USA, Inc.; Petrocon, Inc.; McClarin Plastics, Inc.; Ametek, Inc.; CSS International Corp.; Princo Instruments, Inc.; Emeco Industries, Inc.; David K. Robson, Inc.; Transicoil, Inc.; Horizon Aerospace, L.L.C.; Hulltronics, Inc.; Kosempel Manufacturing Company; Keystone Environmental Services, Inc.; Philadelphia Steel Drum Co., Inc.; NW Controls, Inc.; Resource Recovery Atlantic, Inc.; and World Fuel Services Corporation.

3. My September 29, 2004 Order (doc. # 306) allowed Action Manufacturing to add Atlantic and Corp. as defendants without prejudice to Corp. and Atlantic to oppose the joinder.

2004, Action Manufacturing requested an extension of time to respond so that it could conduct discovery on the issue of personal jurisdiction. (Doc. # 325.) On December 13, 2004, I granted this motion. (Doc. # 330.) On December 30, 2004, Action Manufacturing filed a motion to compel discovery. (Doc. # 343.) On February 2, 2005, I granted in part and denied in part Action Manufacturing's motion to compel. (Doc. # 403.) My February 2, 2005 Order specifically stated that

> [Corp.] must answer any discovery requests regarding its own contacts with Pennsylvania. [Corp.] must also answer any discovery requests regarding the relationship between [Corp.] and each of the following entities: International Recovery. Corp., Resource Recovery of America, Inc., Resource Recovery Atlantic, Inc., and Resource Technology Services, Inc.

(*Id.*) On February 28, 2005, Corp. filed a motion to quash Action Manufacturing's subpoena issued to World Fuel Services, Inc., on the grounds that it went beyond the scope of discovery allowed in my February 2, 2005 order. (Doc. # 416.) I denied the motion to quash on March 14, 2005 and ordered Corp. to "answer any discovery requests regarding the relationship between WFSC [Corp.] and each of the following entities: International Recovery Corp., Resource Recovery of America, Inc., Resource Recovery Atlantic, Inc., Resource Technology Services, Inc., and World Fuel Services, Inc." (Doc. # 437.)

On May 2, 2005, Action Manufacturing filed a memorandum of law in opposition to Corp.'s motion to dismiss for lack of personal jurisdiction. (Doc. # 481; hereinafter "Pl.'s Resp.") Action Manufacturing's response included excerpts of deposition transcripts as well as other documentary exhibits. On May 6, 2005, Corp. filed a reply in support of its motion. (Doc. # 483; hereinafter "Def.'s Reply.") On May 10, 2005, Action Manufacturing filed a rebuttal memorandum in opposition to Corp.'s motion. (Doc. # 486; hereinafter "Pl.'s Sur-reply.") [4]

## III. FACTUAL BACKGROUND

### A. The Relevant Parties

Defendant World Fuel Corp. is incorporated under the laws of Florida and has its principal place of business in Florida. (2nd Am. Compl. ¶ 63; Def.'s Reply at 1.) Corp. is not registered to do business in Pennsylvania. Parties agree that Corp. is a holding company that has no customers and sells no goods or services. (Pl.'s Resp. at 1; Def.'s Reply at 1.) According to Robert Tocci, the executive vice-president of Corp., Corp. "doesn't engage in business. The operating subsidiaries of [Corp.] actually engage in business." (Tocci Dep. at 11.)

World Fuel Services, Inc. ("World Fuel Inc." or "Inc.") is a wholly-owned subsidiary of Corp., purchased by Corp. in 1994. (Def.'s Reply Ex. B.) Inc. consented to jurisdiction in Pennsylvania by registering with the Pennsylvania Department of State to do business in Pennsylvania. (Tocci Dep. at 11; Romine Decl. Ex. 4.) [5] Inc. provides aviation fuel and related services under the trade name "World Fuel." (Tocci Dep. at 17.) The activities of World

---

**4.** Although Action Manufacturing did not ask for prior permission to file this sur-reply brief, I will consider the brief in deciding the instant motion.

**5.** All exhibits attached to the declaration of David Romine, counsel for plaintiffs, shall be referred to as ("Romine Decl. Ex. _"). Exhibit 4 is a record of Inc.'s application to do business in Pennsylvania as a foreign business corporation, available at: https://www.dos.beta.state.p a.us/CorpsApp/Corpsweb/Search /wfEntityDetails.aspx?EntityNo=1544264 & FilingNo=4.

Fuel Inc. are unrelated to the pollution claims in this case.

## B. The Leadership of Inc.

Inc. is registered to do business in Pennsylvania. (Romine Decl. Ex. 4.) Michael Clementi ("Clementi") serves as Inc.'s sole director as well as its president and chief operating officer. (Romine Decl. Ex. 10.)[6] As the sole director of Inc., Clementi chooses the individuals who serve as officers of Inc. (Clementi Dep. at 96; Romine Decl. Ex. 10.) Because Clementi is the sole director of Inc., Inc. does not hold meetings of the board of directors. (Clementi Dep. at 55.) However, when Inc. had more than one director, the directors held meetings. (Id. at 56.) There is no overlap between the boards of directors of Corp. and Inc. (Compare Romine Decl. Ex. 4 & 10 with Ex. 7[7] at 385.) As president of Inc., Clementi "runs the company" and is "responsible for the bottom line, sales, marketing, collections, profitability, the whole thing." (Clementi Dep. at 5–6.)

Clementi negotiated the terms of his own employment agreement with Paul Stebbins, who is the chairman and chief executive officer of Corp., the Florida holding company. (Clementi Dep. at 44.) The board of directors of Corp. has the power to decide whether Clementi remains in his position at Inc. (Id. at 39–40; Romine Decl. Ex. 7 at 385.) However, Clementi is not an executive officer of Corp. nor is he an employee of Corp. (Clementi Dep. at 4.) Clementi's salary and bonuses are paid by Inc. (Clementi Dep. at 5, 7, 43.) Part of Clementi's compensation consists of op-

tions to purchase shares of Corp. stock. (Id. at 40.) Corp. allocates the costs of these options back to Inc. (Id. at 106.)

Clementi is also an officer and director of six other Corp. subsidiaries. (Clementi Dep. at 6.) Clementi's employment agreement with Inc. requires him to perform those duties. (Id. at 28.) These other Corp. subsidiaries do not give Clementi any cash compensation for the work that he does for them. (Id. at 27–28.) However, the other subsidiaries do reimburse Inc. for Clementi's time. (Id. at 102–03.) Corp. plays no role in this reimbursement. (Id. at 103–04.)

The 2003 Annual Report of "World Fuel Services"[8] reported the activities of Corp. and its subsidiaries and collectively referred to Corp. and its subsidiaries as "we," "our," and "us." (Def.'s Reply Ex. C;[9] Tocci Dep. at 15–16.) In this report, Clementi is listed as an executive officer of Corp. with the title of president and chief operating officer of "Aviation Fuel Services." (Romine Decl. Ex. 7 at 385.) According to Tocci, Clementi is shown in Corp.'s annual report as an executive officer of Corp. because he is in a "policy-making position of a principal subsidiary of the company" and Securities and Exchange Commission (SEC) rules require that Corp. lists such individuals as executive officers of the parent company. (Tocci Dep. at 70.) Corp.'s SEC proxy statement to the SEC included information on the executive officers of Corp. and "its principal subsidiaries" and characterized Clementi as "President of the Company's

---

**6.** Exhibit 10 of Romine's Declaration is a document entitled "Unanimous Written Consent of Sole Shareholder and Directors of World Fuel Services, Inc. in Lieu of Annual Meeting."

**7.** Exhibit 7 of Romine's Declaration contains excerpts from "World Fuel Services 2003 Annual Report."

**8.** The cover of the annual report only uses the title "World Fuel Services." The cover does not distinguish between Corp. and Inc.

**9.** Exhibit C of Corp.'s reply in support of its motion to dismiss also contains excerpts from "World Fuel Services 2003 Annual Report."

Aviation and Fuel Services Segment." (Romine Decl. Ex. 11[10] at 15.)

### C. Shared Services Between Inc. and Corp.

Corp. and Inc. share the same Florida office space, mailing address, and phone number and the same website. (Clementi Dep. at 49–50; Romine Decl. Ex. 7 at 385, Ex. 8 at 1.) The sign for the Florida office states Corp.'s name only. (Clementi Dep. at 51.) Corp. leases this office space and Corp. allocates a cost to Inc. based on Inc.'s proportionate share of the space. (*Id.* at 105–06.) The space in this office occupied by Inc. is "broadly separated" from the space occupied by Corp. (*Id.* at 51.) Corp. provides Inc. with human resources services, including training, and information technology services. (*Id.* at 52–53, 107.) Inc. reimburses Corp. for these services. (Clementi Dep. at 59–60; Tocci Dep. at 57–58.)

### D. The Finances of Inc.

Inc. pays dividends to Corp., its sole shareholder. (Clementi Dep. at 29, 34.) Inc. also reinvests its earnings in itself. (*Id.* at 30–31.) One of the vice-presidents of Corp. participates in the decision of when Inc. should pay a dividend. (*Id.* at 29.) However, Clementi and the chief financial officer of Inc. are the ones who "fully decide" the amount of the dividend. (*Id.* at 30.) Inc. and Corp. maintain separate bank accounts. (Tocci Dep. at 28.) Inc. is "overall" self-funded and only borrows money from Corp. occasionally. (Clementi Dep. at 36.) At one point Inc. received a no-interest loan from Corp., and no loan papers were signed regarding this loan. (*Id.* at 34–35.) This loan did not include interest payments because Corp. self-funded the loan and did not incur any interest expenses itself when generating the loan. (*Id.* at 83–84.) The loan was repaid in full. (*Id.* at 34.)

## IV. STANDARD OF REVIEW

■ Once the defendant raises the question of personal jurisdiction, the plaintiff bears the burden of establishing the court's jurisdiction over the defendant. *Miller Yacht Sales, Inc., v. Smith,* 384 F.3d 93, 97 (3d Cir.2004). "[T]he plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." *Patterson by Patterson v. F.B.I.* 893 F.2d 595, 604 (3d Cir.1990) (quoting *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61 (3d. Cir.1984)). "[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction." *Id.*

■ When the court does not hold an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction, "the plaintiff need only establish a *prima facie* case of personal jurisdiction," plaintiff's allegations should be taken as true, and any *disputed* facts should be resolved in favor of the plaintiff. *Miller Yacht,* 384 F.3d at 97. In order to establish a *prima facie* case, the plaintiff must present specific facts that would allow the court to exercise jurisdiction over the defendant. *See United States v. Swiss American Bank, Ltd.,* 274 F.3d 610, 619 (1st Cir.2001) ("The *prima facie* showing must be based upon evidence of specific facts set forth in the record ... [and] go beyond the pleadings and make affirmative proof") (internal quotations omitted); *In re Magnetic Audiotape Antitrust Litigation,* 334 F.3d 204, 206 (2d Cir.2003) ("Where plaintiff has engaged in jurisdictional discovery, but no evidentiary hearing was conducted, the

---

**10.** Exhibit 11 of Romine's Declaration is a document titled "Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934."

plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant") (internal quotations omitted); *Meier ex rel. Meier v. Sun Intern. Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir.2002) ("A *prima facie* case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict") (internal quotations omitted).

## V. DISCUSSION

Fed.R.Civ.P. 4(e) allows a district court to assert personal jurisdiction over a non-resident to the extent allowed by the law of the forum state. *Time Share Vacation Club*, 735 F.2d at 63 (3d Cir.1984). Pennsylvania's long-arm statute provides that a court may exercise personal jurisdiction over non-residents "to the fullest extent allowed under the Constitution of the United States." 42 Pa.C.S.A. § 5322(b).

 The Due Process Clause of the Fourteenth Amendment guarantees that *in personam* jurisdiction may only be asserted over a nonresident defendant corporation if that defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quotation omitted). This due process analysis is broken into a two-part inquiry. The first part focuses on whether the defendant has minimum contacts with the forum "such that [he] should reasonably anticipate being haled into court there," *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The sec-

ond part focuses on whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316, 66 S.Ct. 154. In the instant case, because Action Manufacturing fails to satisfy the minimum contacts requirement of the due process inquiry, there is no need to reach the second-step.

### A. Specific Jurisdiction

 A court may exercise personal jurisdiction over a defendant if the defendant has specific or general contacts with the forum. Specific jurisdiction is appropriate only if the cause of action is related to or arises out of the defendant's forum-related activities, so that it should reasonably expect to be haled into court. *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151 (3d Cir. 1996); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The defendant must have "purposefully directed his activities at residents of the forum" and the litigation must have resulted from alleged injuries that "arise out of or relate[ ] to those activities." *BP Chem., Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir.2000) (internal quotations omitted). This determination is both claim-specific and defendant-specific. *See Remick v. Manfredy*, 238 F.3d 248, 255–56 (3d Cir.2001).

Action Manufacturing has not sought to prove that Corp. has "purposely directed [its] activities at a resident of the forum" nor that the injuries alleged in this lawsuit "arise out of or relate" to those activities, a necessary showing for establishing specific jurisdiction. *BP Chem. Ltd.*, 229 F.3d at 259. Rather, Action Manufacturing only argues for the exercise of general jurisdiction.[11]

---

11. Action Manufacturing's Second Amended Complaint seems to allege the basis for exercising specific personal jurisdiction over Corp. through its relationship to Resource

Recovery Atlantic ("Atlantic") and Resource Technology Services ("RTS"), RTS being the only entity that allegedly transported hazard-

## B. General Jurisdiction

 If the claims asserted in the lawsuit do not "arise out of" the defendant foreign corporation's activities, a court may still assert general personal jurisdiction over the defendant corporation if the corporation has "continuous and systematic" contacts with the forum state. *Helicopteros*, 466 U.S. at 414–16, 104 S.Ct. 1868. Other than Corp.'s simply being a "public corporation," plaintiffs make no claim that Corp. itself possesses the requisite continuous and systematic contacts with Pennsylvania to establish general jurisdiction. Action Manufacturing presents two grounds for finding general jurisdiction over World Fuel Corp.: (1) That World Fuel Inc. has continuous and systemic contacts with Pennsylvania and that Inc.'s jurisdictional contacts should be imputed to Corp. and (2) that Corp. has sufficient contacts with Pennsylvania simply because it is a public corporation.

### 1. Imputing Inc.'s Jurisdictional Contacts to Corp.

Action Manufacturing argues that Corp. has continuous and systematic contacts with Pennsylvania through its subsidiary World Fuel Inc. (Pl.'s Resp. at 3–9.) Inc. has continuous and systemic contacts with Pennsylvania and has consented to general personal jurisdiction in Pennsylvania by registering as a foreign corporation doing business in the state of Pennsylvania. 42 Pa.C.S.A. § 5301(a)(2)(i); (Romine Decl. Ex. 4). According to Action Manufacturing, the relationship between Corp. and Inc. is such that Inc.'s contacts with Pennsylvania should be imputed to Corp. (Pl.'s Resp. at 3–9.) Action Manufacturing's arguments are unconvincing.

 "[A] foreign corporation is not subject to the jurisdiction of the forum state merely because of its ownership of the shares of stock of a subsidiary doing business in that state." *Lucas v. Gulf & Western Industries, Inc.*, 666 F.2d 800, 805–6 (3d Cir.1981) (abrogated on other grounds by *EF Operating Corp. v. American Bldgs.*, 993 F.2d 1046, 1049 (3d Cir. 1993)); *see also Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336, 45 S.Ct. 250, 69 L.Ed. 634 (1925). Stated differently, "[a] parent-subsidiary relationship is by itself an insufficient reason to pierce the corporate veil in the jurisdictional context." *Dutoit v. Strategic Minerals Corporation*, 735 F.Supp. 169, 171 (E.D.Pa.1990) (refusing to find jurisdiction over a foreign corporation with a subsidiary in Pennsylvania because "plaintiffs have not shown that corporate formalities have been disregarded in any significant way" nor did plaintiff demonstrate that the subsidiary acted as the parent's agent in Pennsylvania), *aff'd*, 922 F.2d 830 (3d Cir. 1990) (unpublished table decision) (Becker, Nygaard, & Alito, JJ.). In order to impute the jurisdictional contacts of Inc. to Corp., Action Manufacturing must overcome the general rule that mere ownership of a subsidiary does not subject the parent corporation to personal jurisdiction in the state of the subsidiary. In the context of a motion to dismiss, Action Manufacturing need make only a *prima facie* case for why this general rule does not apply in the instant case and why Inc.'s jurisdictional contacts should be imputed to Corp.

Parties have not cited to and I have not found any Third Circuit cases setting forth a definitive test for when, for the purposes of personal jurisdiction, contacts of a subsidiary may be imputed to its parent corporation. However, the Third Circuit has set forth some factors which should be

---

ous materials to the Malvern Superfund Site. (Compl.¶¶ 59–67.) However, in its response to Corp.'s motion to dismiss, Action Manufac-

turing makes no mention of either Atlantic or RTS nor does it make an argument for specific jurisdiction.

considered in determining whether a court has jurisdiction, such as whether the subsidiary corporation played a part in the transactions at issue, whether the subsidiary was merely the alter ego or agent of the parent, and whether the independence of the separate corporate entities was disregarded. *Lucas,* 666 F.2d at 806. In addition to these factors listed by the Third Circuit, other courts in this district have held that "contacts should be imputed when the subsidiary was either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself." *Arch v. American Tobacco Company, Inc.,* 984 F.Supp. 830, 836–37 (E.D.Pa.1997); [12] *Gallagher v. Mazda Motor of America, Inc.,* 781 F.Supp. 1079, 1085 (E.D.Pa.1992); *Mirrow v. Club Med., Inc.,* 118 F.R.D. 418, 419–20 (E.D.Pa.1986).

 One of the relevant factors in determining whether the jurisdictional contacts of a subsidiary should be imputed to the parent corporation is whether the subsidiary is the alter ego of the parent. *Lucas,* 666 F.2d at 806; *Arch,* 984 F.Supp. at 837. The test for determining whether a subsidiary is the alter ego of its parent is articulated in various ways. The Third Circuit has held that a parent corporation can be held responsible for the liabilities of a subsidiary, *i.e.* piercing the corporate veil, if the plaintiff can show that the subsidiary corporation is really the alter-ego of the parent corporation.[13] *Pearson v. Component Technology Corp.,* 247 F.3d 471, 484–85 (3d Cir.2001). This alter ego test looks to the following factors:

gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is

**12.** In *Arch,* Judge Newcomer suggested a comprehensive evaluation approach:

> Instead of applying one rigid test in lieu of all the other tests, this Court believes that it should examine all relevant factors that relate to the intimacy of the relationship between the parent and subsidiary to assess whether the contacts of the subsidiary with a particular state should be imputed to the parent. Under this test the court is free to examine all relevant factors such as whether the subsidiary corporation played any part in the transactions at issue, whether the subsidiary was merely the alter ego or agent of the parent (this factor perforce incorporates all the factors that have been historically used in determining whether a subsidiary is the alter ego or agent of the parent), whether the independence of the separate corporate entities was disregarded, and whether the subsidiary is necessarily performing activities that the parent would otherwise would have to perform in the absence of the subsidiary.

984 F.Supp. at 837. The *Arch* test is commonly relied on in the Eastern District of Pennsylvania. *See Directory Dividends, Inc. v. SBC Communications, Inc.,* 2003 WL 21961448, *3 n. 3 (E.D.Pa. July 2, 2003); *In Re Latex Gloves Products Liability Litigation,* 2001 WL 964105, *3 n. 10 (E.D.Pa. August 22, 2001) (citing other E.D. Pa. cases that rely on the *Arch* test).

**13.** World Fuel Corp. argues that the standard for piercing the corporate veil in a jurisdictional context, *i.e.* imputing a subsidiary's jurisdictional contacts to its parent corporation, is the same as the standard for piercing the corporate veil for liability purposes. (Def.'s Reply at 4.) Corp. does not cite to any authority for this proposition. However, the factors considered in deciding whether to pierce the corporate veil for liability purposes are similar to the factors considered in deciding whether to pierce the corporate veil in the jurisdictional context. Additionally, a court should "examine all relevant factors that relate to the intimacy of the relationship between the parent and subsidiary" in deciding whether to impute a subsidiary's jurisdictional contacts to its parent corporation. *Arch,* 984 F.Supp. at 837.

merely a facade for the operations of the dominant stockholder.

*Id.; see also Trustees of Nat. Elevator Industry Pension, Health Benefit and Educational Funds v. Lutyk,* 332 F.3d 188, 194 (3d Cir.2003) (citing *Pearson* as describing the factors for the "Third Circuit alter ego test"). Although *Pearson's* alter-ego test was not set forth in the context of imputing jurisdictional contacts, as *Arch* stated, the alter-ego theory of imputing jurisdictional contacts "perforce incorporates all the factors that have been historically used in determining whether a subsidiary is the alter ego ... of the parent." 984 F.Supp. at 837. A plaintiff can also show that a subsidiary is the alter ego of a parent corporation, such that imputing jurisdictional contacts is appropriate, by demonstrating that "the degree of control exercised by the parent is greater than normally associated with common ownership and directorship" and that "the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent." *Directory Dividends, Inc. v. SBC Communications, Inc.,* 2003 WL 21961448, *3 (E.D.Pa. July 2, 2003) (citing *Arch,* 984 F.Supp. at 837; other citations omitted); *see also Doe v. Unocal Corp.,* 248 F.3d 915, 926 (9th Cir.2001) ("An alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations").

With all of these factors in mind, I turn to circumstances of the relationship between Inc. and Corp. Even taking all of Action Manufacturing's allegations[14] to be true and resolving all factual disputes in favor of Action Manufacturing, Action Manufacturing fails to make out a *prima facie* case that Inc.'s jurisdictional contacts should be imputed to Corp.

Action Manufacturing focuses on two factors in arguing that Inc.'s contacts should be imputed to Corp.: (1) that Inc. is engaged in activities that Corp. would otherwise have to perform (Pl.'s Resp. at 3–5) and (2) that Corp. controls Inc. (*id.* at 6–9). In support of the first factor, Action Manufacturing points out that Corp., through its 2003 Annual Report, represents itself to the public as a "global leader in the downstream marketing and financing of aviation and marine fuel products and related services." (*Id.* at 4; Romine Decl. Ex. 7 at 315.) It is undisputed that Corp., as a holding company, does not have any customers nor sell any goods or services. (Pl.'s Resp. at 1; Def.'s Reply at 1.) Therefore, according to Action Manufacturing, Inc. performs functions in Pennsylvania—the marketing and financing aviation fuel—that Corp. itself would otherwise have to perform. (Pl.'s Resp. at 4.)

Plaintiff's argument fails because, in the case of holding companies, "the subsidiary is not performing a function that the parent would otherwise have had to perform itself (the holding company could simply hold another type of subsidiary). In such a case, imputing jurisdictional contacts would be improper." *Gallagher v. Mazda Motor of America, Inc.,* 781 F.Supp. 1079, 1085 (E.D.Pa.1992); *see also In Re Latex Gloves Products Liability Litigation,* 2001 WL 964105, *2 n. 8 (E.D.Pa. August 22, 2001) (explaining that the agency rule of imputing jurisdictional contacts when a subsidiary is engaged in

---

**14.** Action Manufacturing's second amended complaint is devoid of any allegation that would support imputing Inc.'s jurisdictional contacts to Corp. Indeed, Inc. is not mentioned at all in the complaint. As I stated earlier, Action Manufacturing's complaint only alleges the basis for exercising specific personal jurisdiction over Corp. through its relationship to Resource Recovery Atlantic ("Atlantic") and Resource Technology Services ("RTS"). (Compl. ¶¶ 59–67.)

activities that the parent would have to undertake itself "ordinarily does not apply to a holding company inasmuch as the parent could simply use another subsidiary to accomplish the same result"); *Arch,* 984 F.Supp. at 837. *See also Unocal,* 248 F.3d at 929–30 (endorsing the *Gallagher* court's holding that imputing a subsidiary's jurisdictional contacts to its parent on an agency theory is improper when the parent corporation is merely a holding company).

Action Manufacturing next argues that Corp. controls Inc. (Pl.'s Resp. at 6–9.) In support of this argument, Action Manufacturing seems to be arguing that Clementi, as the president, chief operating officer, and sole director of Inc., is actually an employee of Corp. and controlled by Corp. There is no dispute that Clementi controls the day-to-day activities of Inc. Clementi "runs the company" and is "responsible for the bottom line, sales, marketing, collections, profitability, the whole thing." (Clementi Dep. at 5–6.) Action Manufacturing points out that Clementi negotiated his employment agreement with Paul Stebbins, the chairman and chief executive officer of Corp., and that Clementi can be fired by the Corp. board of directors. (Clementi Dep. at 39–40; Pl.'s Resp. at 7.) Action Manufacturing also points out that Clementi's compensation includes options to purchase shares of Corp. stock. (Clementi Dep. at 40.) However, Clementi's salary and bonuses are paid by Inc. (*Id.* at 5, 7, 43.) While Clementi's compensation includes options to purchase shares of Corp.

stock, Inc. reimburses Corp. for these options. (*Id.* at 40.)

These facts do not indicate day-to-day control by Corp. over Clementi's actions. Indeed, other courts have recognized that the "officers of any corporation that owns the stock of another necessarily exercise a considerable degree of control over the subsidiary corporation and the discharge of that supervision alone is not enough to subject to parent to ... jurisdiction." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corporation,* 751 F.2d 117, 120 (2d Cir.1984) (citations omitted).[15] Action Manufacturing fails to present facts showing that Corp.'s supervision over Clementi is greater than that normally associated with parent-subsidiary relationships.

Action Manufacturing also points to a 2003 Annual Report and Corp.'s SEC proxy statement as indications that Clementi is actually an employee of Corp. and that Inc. is merely a department of Corp. (Pl.'s Resp. at 6.) The 2003 report lists Clementi as an executive officer of Corp. with the title of president and chief operating officer of "Aviation Fuel Services," and the SEC proxy statement lists Clementi as "President of the Company's Aviation and Fuel Services Segment." (Romine Decl. Ex. 7 at 385; Ex. 11 at 15.) However, "references in the parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego rela-

**15.** The *Volkswagenwerk* court ultimately asserted jurisdiction over a foreign corporation through its wholly-owned subsidiary. 751 F.2d at 119. In reaching its conclusion, the court focused on the following factors: (1) the subsidiary was wholly-owned by the parent, an essential factor, but not the only factor, in asserting jurisdiction over the foreign parent, *id.* at 120; (2) the subsidiary was "wholly dependent on [the parent's] financial support to stay in business," *id.* at 121; (3) the highest ranking officers of the subsidiary were identical to the highest ranking officers of the parent, *id.*; and (4) the parent tightly controlled the marketing policies of its subsidiary, including location of signs, minimum inventory levels, accounting systems, insurance policies, and advertising campaigns, *id.* at 122. With the exception of the first factor, which by itself is insufficient to establish jurisdiction, the factors relied on by the *Volkswagenwerk* court to establish jurisdiction over a foreign parent corporation through its subsidiary are not present in the instant case.

tionship." *Unocal,* 248 F.3d at 928 (affirming district court's refusal to attribute the contacts of subsidiaries to a parent corporation). Additionally, a closer examination of these two documents indicate that Inc. and Corp. were not ignoring the line between their separate corporate entities. The SEC proxy statement specifically stated that it included information on the executive officers of Corp. and "its principal subsidiaries." (Romine Decl. Ex. 11 at 15.) Similarly, the 2003 Annual Report was a report of "World Fuel Services" that collectively referred to Corp. and its subsidiaries as "we," "our," and "us." (Def.'s Reply Ex. C; Tocci Dep. at 15–16.) According to Robert Tocci, the executive vice-president of Corp., Clementi is shown in the 2003 Annual Report as an executive officer of Corp. because he is in a "policy-making position of a principal subsidiary of the company" and SEC rules require that Corp. lists such individuals as executive officers of the parent company. (Tocci Dep. at 70.) [16]

Even if, contrary to the deposition testimony,[17] Clementi were an officer of Corp. as well as an officer of Inc., the Supreme Court has recognized that it is "normal for a parent and subsidiary to have identical directors and officers." *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (citations omitted). Indeed, the fact that there is no overlap between the boards of directors of Corp. and Inc. is another indication that Corp. does not control the day-to-day activities of Inc. (Compare Romine Decl. Ex. 4 & 10

with Ex. 7 at 385.) The *Arch* court found that even when there are overlapping directors between a parent company and its wholly-owned subsidiary, this is not sufficient to establish an alter ego relationship and it does not establish that the parent's supervision over the subsidiary is greater than that normally associated with parent-subsidiary relationships. 984 F.Supp. at 838.

Outside of arguing that Inc. performs functions that Corp. would otherwise have to perform and that Corp. controls Inc., Action Manufacturing does not directly address any of the other factors that would support imputing Inc.'s jurisdictional contacts to Corp. I will now consider some of these factors.

The Third Circuit stated that "whether the subsidiary corporation played any part in the transactions at issue" is relevant to whether the subsidiary's contacts with the forum state should be imputed to the parent. *Lucas,* 666 F.2d at 806. It is undisputed that the subsidiary, World Fuel Inc., did not play a part in the transaction at issue in this lawsuit, that is the contamination of the Malvern Superfund Site. Thus, this factor does not support imputing Inc.'s jurisdictional contacts to Corp.

Considering some of the factors in the *Pearson* alter-ego test, Action Manufacturing does not attempt to rely on the fact that Inc. is undercapitalized or insolvent. On the contrary, according to Clementi, the president of Inc., Inc. is "overall" self-funded, "runs on [its] own positive cash

---

**16.** Corp. did not provide a cite to the exact SEC rule that Tocci was referring to in his deposition. However, the relevant regulation seems to be 17 C.F.R. § 240.3b–7, providing the definition of "executive officer."

**17.** In his deposition, Clementi testified as follows:

> Q. . . . Mr. Clementi, are you an executive officer of World Fuel Services Corporation?

> A. No.
> Q. Are you an employee of World Fuel Services Corporation?
> A. No.
> Q. Do you have an employment agreement with World Fuel Services Corporation?
> A. No.
> (Clementi Dep. at 4.)

flow," and only borrows money from Corp. occasionally. (Clementi Dep. at 36.) Although Inc. received a no-interest loan from Corp. and no loan papers were signed regarding this loan, the loan was repaid in full. (*Id.* at 34–35.) Additionally, according to Clementi, the loan did not include interest payments because Corp. self-funded the loan and did not incur any interest expenses itself when generating the loan. (*Id.* at 83–84.) Thus, the existence of this interest-free loan does not indicate that Inc. is insolvent or undercapitalized.

Action Manufacturing also does not rely on the fact that Corp. siphons funds from Inc., another factor of the *Pearson* test. On the contrary, Inc. reinvests its earnings in itself. (Clementi Dep. at 30–31.) Inc. also sometimes pays dividends to Corp., its sole shareholder, another factor cutting against an alter-ego finding under *Pearson.* (*Id.* at 29, 34.) Although one of the vice-presidents of Corp. participates in the decision of when Inc. should pay a dividend, Clementi and the chief financial officer of Inc. are the ones who "fully decide" the amount of the dividend. (*Id.* at 29–30.) Furthermore, the Supreme Court has recognized that a parent corporation's "supervision of [a] subsidiary's finance and capital budget decisions" is "consistent with the parent's investor status." *Bestfoods,* 524 U.S. at 72, 118 S.Ct. 1876.

Inc. also has functioning officers and directors, another of the *Pearson* factors. Clementi, as the president and chief operating officer of Inc., "runs the company" and is "responsible for the bottom line, sales, marketing, collections, profitability, the whole thing." (Clementi Dep. at 5–6.) As the sole director of Inc., Clementi chooses the individuals elected as officers of Inc. (*Id.* at 96; Romine Decl. Ex. 10.) Clementi and the chief financial officer of Inc. participate in the decision of when to pay dividends and the amount of those

dividends. (Clementi Dep. at 30.) The extent of Clementi's duties indicates that Inc. has functioning officers and directors.

Inc. and Corp. observe corporate formalities and the independent corporate forms of the two companies is respected. Inc. and Corp. maintain separate bank accounts. (Tocci Dep. at 28.) While Corp. and Inc. share services, such as human resources and information technology services (Clementi Dep. at 52–53, 107), and office space and infrastructure (*id.* at 49–50; Romine Decl. Ex. 7 at 385; Ex. 8 at 1), Inc. reimburses Corp. for these services and the office space (Clementi Dep. at 59–60, 105–06; Tocci Dep. at 57–58). This reimbursement indicates that Inc. and Corp. are maintaining their corporate separateness and observing corporate formalities. Additionally, the fact that Inc. pays dividends to Corp. is another indication that Corp. and Inc. are observing corporate formalities.

Taking into account all the factors discussed above, all of which are relevant to the intimacy of the relationship between Inc. and Corp., Action Manufacturing fails to establish a *prima facie* case that the jurisdictional contacts of Inc. should be imputed to Corp.

### 2. No General Jurisdiction over Corp. as a Public Company

Action Manufacturing also argues that I have general jurisdiction over Corp. because Corp. is a public company whose shares are traded on the New York Stock Exchange ("NYSE") and these shares have been offered for sale to the public within the United States, including Pennsylvania. (Pl.'s Resp. at 9.) Action Manufacturing does not offer any caselaw in support of this argument. Other courts have held that the national sale of stock on the NYSE in and of itself is not sufficient to confer personal jurisdiction. *See, e.g.,*

*Telecordia Technologies, Inc. v. Alcatel S.A.,* 2005 WL 1268061, *7 (D.Del. May 27, 2005) (defendant's listing on the NYSE is not sufficient to establish personal jurisdiction in the state of Delaware); *Wiwa v. Royal Dutch Petroleum,* 226 F.3d 88, 97 (2d Cir.2000) (finding that the prevailing caselaw allows foreign corporations substantial latitude to list their securities on New York-based stock exchanges and to take the steps necessary to facilitate those listings without thereby subjecting themselves to New York jurisdiction for unrelated occurrences). The sale of shares of World Fuel Corp. stock to the national public through the NYSE does not constitute continuous and systematic contacts with Pennsylvania and is not sufficient to establish general personal jurisdiction over Corp. in Pennsylvania.

### C. No Waiver of Defense of Lack of Jurisdiction

Action Manufacturing also contends that World Fuel Corp. waived its lack of personal jurisdiction argument when it sought affirmative relief from the court in the form of a motion to quash a subpoena issued to World Fuel Inc. (Pl.'s Resp. at 11–12.) However, Corp. did not waive its jurisdictional defense when it participated in jurisdictional discovery pursuant to a court order.

When plaintiffs have alleged with reasonable particularity the possible existence of the requisite contacts between the defendant and the forum state, the plaintiff has the right to conduct discovery before the district court dismisses for lack of personal jurisdiction. *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 455–56 (3d Cir.2003). Corp. filed its motion to dismiss for lack of personal jurisdiction on November 22, 2004. (Doc. # 323.) In response, Action Manufacturing requested an extension of time to respond so that it could conduct discovery on the issue of personal jurisdiction. (Doc. # 325.) Action Manufacturing also filed a motion to compel discovery. (Doc. # 343.) I granted both motions. (Doc. # 330, 403.) Corp. later filed a motion to quash Action Manufacturing's subpoena (doc. # 416) on the grounds that it went beyond the scope of discovery allowed in my order granting the motion to compel (doc. # 403). The "affirmative relief" that Corp. sought in its motion to quash was sought in the midst of jurisdictional discovery and was related to jurisdictional discovery. Corp. cannot be held to have waived its defense of lack of jurisdiction for responding, as it was required to do, to plaintiff's jurisdictional discovery requests.

The only case Action Manufacturing cites in support of its argument is *Neifeld v. Steinberg,* 438 F.2d 423 (3d Cir.1971). In *Neifeld,* the Third Circuit lists various cases finding that defendants seeking affirmative relief from the court, in the form of a counterclaim, waive the defenses of lack of personal jurisdiction or improper venue. *Id.* at 429 n. 13. However, in discussing those cases, the court noted, "There is a paucity of reasoning in each of the aforementioned cases...." *Id.* The *Neifeld* court ultimately held that the defendant did not waive its jurisdictional defense by asserting a permissive counterclaim which it later withdrew without permission of the court. *Id.* at 426–431. Thus, the only case that Action Manufacturing cites does not support its argument. Corp. did not waive its jurisdictional defense by moving to quash a subpoena while responding to Action Manufacturing's jurisdictional discovery requests.

## VI. CONCLUSION

For the reasons stated above, Action Manufacturing fails to present a *prima facie* case that World Fuel Corp. has sufficient minimum contacts with Pennsylvania

to establish personal jurisdiction. Action Manufacturing also fails to show that World Fuel Corp. waived its defense of lack of personal jurisdiction. Therefore, defendant World Fuel Corp.'s motion to dismiss is granted.

## ORDER

AND NOW, this ＿20th＿ day of June 2005, it is **ORDERED** that defendant World Fuel Services Corporation's motion to dismiss (doc. # 323) is **GRANTED**. All claims against defendant World Fuel Services Corporation are **DISMISSED**.